## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
378 N Main Avenue
Tucson, AZ 85701,

NATURAL RESOURCES DEFENSE
COUNCIL,
40 West 20th Street 11th Floor
New York, NY 10011,

*and*

ANIMAL WELFARE INSTITUTE,
900 Pennsylvania Avenue SE
Washington, DC 20003,

*Plaintiffs*,

v.

WILBUR ROSS, *in his official capacity as Secretary*,
U.S. Department of Commerce
1401 Constitution Avenue, NW
Washington, DC 20230,

CHRIS OLIVER, *in his official capacity as Assistant Administrator*,
NOAA Fisheries and National Marine Fisheries Service
1315 East-West Highway
Silver Spring, MD 20910,

STEVEN MNUCHIN, *in his official capacity as Secretary*,
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220,

*and*

KIRSTJEN NIELSEN, *in her official capacity as Secretary*,
U.S. Department of Homeland Security

Case No.

Washington, DC 20528,

*Defendants*.

# COMPLAINT

## INTRODUCTION

1.      The vaquita, a small porpoise that exists only in Mexico's Upper Gulf of California, is one of the world's most endangered animal species, *with likely fewer than 30 vaquita now remaining on Earth*. The vaquita population's precipitous decline of more than 95 percent over the last 20 years is attributable to a single cause: incidental entanglement and drowning in gillnet fishing gear ("bycatch") set in or near vaquita habitat to catch various commercial fish species in Mexico.

2.      Sadly, with so few vaquita remaining and an estimated *annual* population decline of nearly 40 percent in recent years, scientists predict the vaquita faces extinction *by 2019* if current trends continue. Thus, the species' fate on this planet will likely be determined by the coming year's fishing activities.

3.      While the vaquita inhabits Mexico, its fate is closely tied to actions taken and withheld in the United States by both consumers and the U.S. government. Consumers have contributed to the vaquita's precipitous decline by unwittingly demanding, purchasing, and consuming seafood products from the Upper Gulf of California caught by fishermen using vaquita-harmful gillnets. The U.S. government has contributed to the vaquita's decline by failing to keep such seafood out of the market as required by law.

4.      Specifically, the United States has long had both the authority and the mandate to ensure that foreign nations that export seafood to the United States meet the same strong marine mammal protection standards that apply to U.S. fishermen. Section 101(a)(2) of the Marine

Mammal Protection Act ("MMPA") states that the United States, through the National Marine Fisheries Service ("NMFS") and other U.S. agencies, "shall ban the importation of commercial fish or products from fish" sourced in a manner that "results in the incidental kill[ing] or incidental serious injury" of marine mammals like the vaquita "in excess of United States standards." 16 U.S.C. § 1371(a)(2); 50 C.F.R. § 216.24(h).

5.      Congress designed the MMPA in this way to protect and recover marine mammals both domestically and abroad, strictly regulating commercial fisheries in the United States and employing Section 101(a)(2)'s import provision to ensure that the U.S. seafood market is not supporting fishing practices that harm marine mammal populations in foreign nations.

6.      In issuing regulations to implement the MMPA Section 102(a)(2)'s fish import provision, NMFS recognized its authority to conduct immediate, "emergency rulemaking" to ban fish from foreign fisheries that are "having or [are] likely to have an immediate and significant adverse impact on a marine mammal stock," including where bycatch "could result in increased risk of extinction" for "very small populations" of marine mammals, like the vaquita. 81 Fed. Reg. 54,390, 54,395 (Aug. 15, 2016).

7.      On May 18, 2017, the Natural Resources Defense Council, the Center for Biological Diversity, and Animal Welfare Institute ("Plaintiffs") filed a formal, emergency petition requesting that the United States, through NMFS and other relevant agencies, immediately ban the import of fish and fish products sourced from fishing activities in Mexico that harm vaquita in excess of United States standards, as required by MMPA Section 101(a)(2). As of the date of the filing of this Complaint, the government has failed to respond and make a final determination on Plaintiffs' petition.

8.      This case challenges the failure of NMFS, the U.S. Department of Commerce, the U.S. Department of the Treasury, and the U.S. Department of Homeland Security ("Defendants") to respond to Plaintiffs' petition pursuant to the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 551-559; 701-706.

9.      Defendants' delay in responding to Plaintiffs' petition is patently unreasonable given the extreme plight of the vaquita, a species that will be extinct by 2019 if current bycatch trends continue, and for which the MMPA's authority to ban imports, including on an emergency basis, was tailor-made. Because Defendants' delay violates the APA and places the vaquita at a greater risk of extinction, Plaintiffs file this Complaint seeking a declaratory judgment and injunctive relief to compel Defendants to respond substantively to Plaintiffs' petition, as well as fees and costs associated with the litigation.

## JURISDICTION AND VENUE

10.      This lawsuit is brought pursuant to the APA. 5 U.S.C. §§ 551-559, 701-706. Plaintiffs seek judicial review under the APA, 5 U.S.C. § 706(1).

11.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States), 28 U.S.C. § 1346 (action against the United States), 28 U.S.C. § 1361 (power to issue writs of mandamus), 28 U.S.C. §§ 2201-02 (power to issue declaratory judgments and injunctive relief in cases of actual controversy), and 5 U.S.C. § 702 (APA jurisdiction for those adversely affected by agency action).

12.      Venue properly lies in this Court under 28 U.S.C. § 1391(e)(1), as this civil action is brought against officers and employees of the United States acting in their official capacities and under the color of legal authority, several Defendants reside in the District of Columbia, a

substantial part of the events giving rise to the claim occurred in the District of Columbia, no real property is involved in this action, and all Plaintiffs maintain offices in this judicial district.

## PARTIES

13.     Plaintiff Center for Biological Diversity ("the Center") is a 501(c)(3) nonprofit corporation incorporated in the State of California and maintains offices across the country, including in Washington, D.C., California, Arizona, Florida, New York, Oregon, and Washington State, and in Baja California Sur, Mexico. The Center works through science and environmental law to advocate for the protection of endangered, threatened, and rare species and their habitats both in the United States and abroad. The Center has over 63,000 active members and around 1.6 million online activists.

14.     The Center and its members have a strong interest in protecting marine mammals and ensuring fish caught or sold in the United States are harvested in a manner that does not harm marine mammals. Through its Oceans and International Programs, the Center has worked for years to protect marine mammals in the United States and abroad that are threatened by unsustainable or harmful fishing practices, including through advocacy, litigation, and participation as appointed members of five MMPA-mandated take reduction teams. The Center has a long history of actively advocating for protection of the imperiled vaquita within the United States, in Mexico, and at the international level.

15.     The Center's members reside throughout the United States, in Mexico, and in other countries. The Center has members who have visited and have specific plans to return to the vaquita's habitat in Mexico's Upper Gulf of California. For example, Mr. Brett Hartl, a member who resides in San Diego, California, lived in the Upper Gulf in 2003 for ten weeks and traveled extensively between Bahía de Kino and Puerto Peñasco and again visited the region in

2009 near San Felipe. On both trips, he attempted to view, study, and photograph the vaquita in its natural habitat, and he has specific plans to return to the Upper Gulf in spring of 2018 to again attempt to view the vaquita. Another Center member, Mr. Alejandro Olivera, resides in California Baja Sur, Mexico and regularly visits the Upper Gulf of California and the vaquita's habitat for work, including four trips over the past eleven years. Each time Mr. Olivera visits the Upper Gulf, he attempts to view a vaquita, including from on the water, and he has also seen gillnets being used near San Felipe, an area frequented by vaquita. He plans to return to the Upper Gulf this March for work purposes and will once again attempt to view vaquita on this and his future trips. As the vaquita population declines, the Center's members are less likely to view the species in the wild. Further, these members' enjoyment of viewing the vaquita's marine habitat is decreased by observing vaquita-killing gillnets in the vaquita's waters.

16.     Plaintiff Natural Resources Defense Council ("NRDC") is a not-for-profit membership corporation founded in 1970 and organized under the laws of the State of New York. NRDC maintains offices in New York, New York; Washington, D.C.; San Francisco and Santa Monica, California; Chicago, Illinois; Bozeman, Montana; and Beijing, China. NRDC has several hundred thousand members nationwide. NRDC's purposes include the preservation, protection, and defense of our nation's biodiversity and environment. NRDC has long been active in efforts to protect endangered species generally and marine mammals specifically.

17.     NRDC and its members have a long history of protecting specific marine mammal species and populations, like the vaquita, and working to curb threats that impact marine mammals generally, like ocean noise and commercial fishing. Through its Marine Mammal Protection Project, NRDC has worked for more than twenty years to protect marine mammals in the United States and abroad, using various tools including, litigation, advocacy, policy

development, and participation in MMPA-mandated take reduction teams. NRDC has worked to secure greater protections for vaquita within the United States, in Mexico, and in international forums.

18.     Through its Marine Mammal Protection Project, NRDC has worked to realize the promise of the MMPA's import provisions, by securing regulations implementing the MMPA's ban on imports of fish and fish products that fail to meet U.S. standards. NRDC has dedicated substantial resources to this work and has advocated for the U.S. government to ensure that U.S. consumers are not contributing to the harm of marine mammals in excess of U.S. standards with their consumption of imported seafood. NRDC litigated over the U.S. government's failure to implement the MMPA import provisions and, after successfully obtaining a timeline for rulemaking, followed that process closely, submitting comments on the proposed rule. The successful implementation of the rule is a priority for NRDC and its members. NRDC's members include individuals who consume seafood, care about the impact catching fish has on marine mammals, and want to make informed choices about the seafood they eat.

19.     NRDC's members reside throughout the United States and in Mexico. NRDC has members who have visited and have specific plans to return to the vaquita's habitat in Mexico's northern Gulf of California. For example, Mr. Frank Baucom, a member who resides in Amado, Arizona, has visited the northern Gulf of California on numerous occasions and enjoyed seeing wildlife, including porpoises, on his visits. He has specific plans to return to the northern Gulf in the winter or spring of 2018 to sail with family on his brother-in-law's boat and looks forward to seeing wildlife and would love to see a vaquita.

20.     Plaintiff Animal Welfare Institute ("AWI") is an international non-profit animal advocacy organization with its principal place of business in Washington, D.C. Since its

founding in 1951, AWI's mission has been to end human-inflicted animal suffering and exploitation by vigorously defending animals' interests through the law. AWI has a longstanding and well-established interest in protecting the lives and habitats of wildlife, including marine wildlife, from harassment, encroachment, and destruction. AWI's wildlife advocacy department works diligently to protect all fauna, terrestrial and marine, from suffering caused by people, to conserve and recover threatened and endangered species, and seeks to secure protections for animals by engaging with policymakers, scientists, and industry at state, federal, and international levels.

21.   AWI advocates for the protection of marine wildlife, including cetaceans, in Mexico and across the globe. Its advocacy efforts include: speaking on behalf of marine species and representing their interests in international forums such as the International Whaling Commission, including its Scientific Committee; the Convention on Biological Diversity; the Convention on International Trade in Endangered Species of Wild Fauna and Flora; and the United Nations World Heritage Committee; educating constituents and members about cetaceans and the threats they face; and monitoring legislation and research activities that may affect their well-being.

22.   AWI promotes increased protections of marine mammals from unsustainable fishing practices around the globe, especially those practices that cause death due to entanglement in fishing gear. AWI is a member of the International Whaling Commission's Bycatch Mitigation Initiative Standing Working Group, and frequently comments on Marine Stewardship Council fisheries assessments with regard to the impacts of those fisheries on cetaceans. AWI seeks an end to the indiscriminate use of gillnets, responsible for the deaths of hundreds of thousands of marine mammals each year, and which have driven the critically

endangered vaquita to the edge of extinction. In its efforts to save the vaquita, AWI has expended considerable time and organizational resources to meet with government officials in Mexico and the United States, to advocate for the species in various international fora, organized and participated in events to educate governmental delegates to international meetings about the species and its threats, collaborated with other international and non-governmental organizations on projects to promote the protection and recovery of the species, and has provided funding to support the activities of the Comité Internacional para la Recuperación de la Vaquita; the world's foremost scientific body established to study and save the species.

23.     AWI has over 45,000 members worldwide, including members in Mexico and the southwest United States who reside in areas near the Upper Gulf of California and the Colorado River Delta Biosphere Reserve, the principal habitat of the vaquita. AWI members strongly desire to increase protections for the vaquita and its habitat in order to increase the likelihood of species recovery. AWI members purchase and consume or seek to purchase and consume fish caught with minimal impacts to marine mammals.

24.     AWI members have traveled to the Upper Gulf of California and the Colorado River Delta Biosphere Reserve and have specific plans to return to try to observe vaquita. For example, AWI member and consultant, Kate O'Connell, traveled to the Upper Gulf several times in the 1990s, including attending the official designation of the Biosphere Reserve in 1993. She visited Pto. Peñasco and Guaymas in Sonora in 1993 and 1994 and San Felipe in Baja California Norte in 1995 and 1999. During her 1995 trip to San Felipe, she was fortunate enough to catch a fleeting glimpse of a live vaquita from the deck of a small boat. She also attended the CIRVA II meeting in February 1999. Ms. O'Connell has specific plans to return to observe the vaquita in the coming year.

25.     Plaintiffs and their members derive scientific, educational, recreational, conservation, aesthetic, and other benefits from the existence of the vaquita in the wild. These interests have been, are, and will be directly, adversely, and irreparably affected by Defendants' violation of the law. Plaintiffs' members will continue to be prejudiced by Defendants' unlawful actions until and unless this Court provides the relief prayed for in this Complaint.

26.     Defendant Wilbur Ross is the Secretary of the U.S. Department of Commerce. In this capacity, Secretary Ross directs all business of the Department of Commerce. Pursuant to the MMPA, the Department of Commerce is responsible for protecting and managing fish, marine mammals, and other marine resources of the United States, including implementing MMPA Section 101(a)(2). In his official capacity, Secretary Ross is responsible for violations alleged in this Complaint.

27.     Defendant Chris Oliver is the Assistant Administrator of National Oceanic and Atmospheric Administration Fisheries ("NOAA Fisheries"), also known as and referred to in this Complaint as the National Marine Fisheries Service ("NMFS"). NMFS is an agency of the United States Department of Commerce that has been delegated the responsibility to implement the MMPA, including Section 101(a)(2). In his official capacity, Mr. Oliver is responsible for violations alleged in this Complaint.

28.     Defendant Steven Mnuchin is the Secretary of the Treasury. In this capacity, he directs all business of the Department of the Treasury. Pursuant to MMPA Section 101(a)(2), the Department of the Treasury is responsible for banning the importation of commercial fish or fish products that do not meet the MMPA's standards. In his official capacity, Secretary Mnuchin is responsible for violations alleged in this Complaint.

29.     Defendant Kirstjen Nielsen is the Secretary of Homeland Security. In this

capacity, she directs all business of the Department of Homeland Security. Pursuant to the

Homeland Security Act of 2002 and Treasury Order 100-16, certain customs functions were

transferred from the Secretary of the Treasury to the Department of Homeland Security,

including implementation of import bans. 6 U.S.C. §§ 101 *et seq.*; 68 Fed. Reg. 28,322 (May 23,

2003). In her official capacity Secretary Nielsen is responsible for violations alleged in this

Complaint.

## STATUTORY BACKGROUND

### A.     Marine Mammal Protection Act

30.     In 1972, Congress enacted the MMPA finding in part that:

[M]arine mammals have proven themselves to be resources of great international
significance, esthetic and recreational as well as economic, and it is the sense of
the Congress that they should be protected and encouraged to develop to the
greatest extent feasible commensurate with sound policies of resource
management and that the primary objective of their management should be to
maintain the health and stability of the marine ecosystem.

16 U.S.C. § 1361(6). Congress further found that "certain species and population stocks of

marine mammals are, or may be, in danger of extinction or depletion as a result of man's

activities." *Id.* § 1361(1). The MMPA thus contains an array of provisions designed to protect

and recover marine mammals both domestically and abroad.

31.     To address the bycatch of marine mammals in fishing gear, viewed as one of the

primary threats to marine mammals and a major impetus for enacting the MMPA, the statute sets

an "immediate goal that the incidental kill or incidental serious injury of marine mammals

permitted in the course of commercial fishing operations be reduced to insignificant levels

approaching a zero mortality and serious injury rate." *Id.* § 1371(a)(2).

32.     To achieve this goal, the MMPA requires some of the world's most stringent standards for limiting marine mammal bycatch. Specifically, the MMPA requires NMFS to prepare a "stock assessment" for each marine mammal population in U.S. waters, documenting the population's abundance and trend, describing the fisheries that interact with the stock, and estimating the level of "mortality and serious injury" (marine mammal bycatch) caused by those fisheries each year. *Id.* § 1386(a). Based on the stock assessment, the agency must then estimate the "potential biological removal" ("PBR") level for each stock, *id.*, defined as the "maximum number of animals . . . that may be removed . . . while allowing that stock to reach or maintain its optimum sustainable population," *id.* § 1362(20). PBR is a conservative and protective level of take of marine mammals.

33.     NMFS must develop a "take reduction plan" for all marine mammal stocks in which human-caused mortality exceeds the potential biological removal level, and for any stock listed under the Endangered Species Act. *Id.* §§ 1387(f)(1); 1362(19). Each take reduction plan must contain regulatory measures to reduce fishery-related mortality and serious injury to "less than the potential biological removal level" within six months of the plan's implementation. *Id.* § 1387(f)(4), (5). The "long-term goal" of the plan must be to reduce bycatch levels to the "zero mortality and serious injury rate." *Id.* § 1387(f)(2). Finally, the MMPA requires NMFS to monitor and "obtain statistically reliable estimates" of bycatch, including placing observers onboard fishing vessels. *Id.* § 1387(d).

34.     In addition to its provisions related to domestic fisheries, the MMPA regulates the import of fish products into the United States to protect marine mammal species abroad and to ensure a level playing field for U.S. fishermen who must comply with the MMPA's strict marine mammal bycatch standards. Section 101(a)(2) of the MMPA states:

The Secretary of the Treasury[1] shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards. For purposes of applying the preceding sentence, the Secretary [of Commerce]—

(A) shall insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States…

16 U.S.C. § 1371(a)(2).

35.     Thus, the U.S. government through its relevant agencies has a clear duty to ban imports of fish and fish products absent information demonstrating that the fish were caught in accordance with U.S. standards. Since the MMPA places the burden on exporting countries to provide reasonable proof of compliance with U.S. standards, the United States, through the relevant agencies, must demand, obtain, and deem adequate a nation's demonstration that the effects of its fishing practices on marine mammals meet U.S. standards before allowing that nation's fish products to enter the United States.

36.     In August 2016, NMFS promulgated regulations to implement MMPA Section 101(a)(2). 50 C.F.R. Part 216.24; 81 Fed. Reg. 54,390 (Aug. 15, 2016) ("the MMPA Imports Rule"). The Rule sets forth a process for determining whether a fish or fish product that is imported into the United States must be banned for a nation's failure to protect marine mammals consistent with U.S. standards.

---

[1] Pursuant to the Homeland Security Act of 2002 and Treasury Order 100-16, certain customs functions were transferred from the Secretary of the Treasury to U.S. Customs and Border Protection ("CBP"), an agency within the Department of Homeland Security, including implementation of import bans. 6 U.S.C. §§ 101 *et seq.*; 68 Fed. Reg. 28,322 (May 23, 2003).

37.     Under the Rule and in order to export fish to the United States, a nation must apply for and receive from NMFS a "comparability finding" for each relevant export fishery. To receive a comparability finding, a nation must, *inter alia*, maintain a regulatory program that is "comparable in effectiveness" to the United States' regulatory program for reducing incidental mortality and serious injury of marine mammals in the course of commercial fishing operations. 50 C.F.R. § 216.24(h)(6)(iii)(B).

38.     Specifically, to make a comparability finding, NMFS must determine that a exporting/harvesting nation "maintains a regulatory program that provides for, or effectively achieves comparable results as," the United States' regulatory program, including, *inter alia*: (1) conducting marine mammal stock assessments to estimate population abundance for those marine mammals interacting with the export fishery; (2) maintenance of a fishing registry that tracks the number of vessels, effort areas and dates, gear type, and target species; (3) regulatory requirements requiring reporting of bycatch by export fisheries; (4) implementation of a monitoring program to estimate bycatch; (5) calculating bycatch limits for marine mammal populations harmed by export fisheries; and, critically, (6) demonstrating that the serious injury or mortality caused by the export fisheries "do not exceed the bycatch limit" for any marine mammal stock. *Id.* § 216.24(h)(6)(iii)(C). The "bycatch limit" is defined as the "potential biological removal level" for the particular marine mammal stock or a "comparable metric." *Id.* § 216.3.

39.     The MMPA Imports Rule purports to allow for a five-year phase-in or "one-time exemption period" to allow nations time to develop and refine the necessary regulatory programs for obtaining a comparability finding. *Id.* § 216.24(h)(2)(ii). However, in issuing the Rule, NMFS also recognized that some marine mammal populations may need immediate relief from

exporters' non-compliance with the MMPA's import provisions. The Rule therefore recognizes that NMFS may conduct "emergency rulemaking" to immediately ban fish or fish product imports from a fishery "having or likely to have an immediate and significant adverse impact on a marine mammal stock." 81 Fed. Reg. at 54,395.

40.     NMFS explained that this provision allows "for timely treatment of cases where the usual process and timeframe could result in unacceptable risks to the affected marine mammal stock or species." *Id.* NMFS describes one category of "unacceptable ecological risk" as a "very small population[ ] where any incidental mortality could result in increased risk of extinction." *Id.*

41.     Additionally, the MMPA established the Marine Mammal Commission ("the MMC") an independent U.S. agency. 16 U.S.C. § 1401(a). Among other duties, the MMC is directed to "recommend to the Secretary [of Commerce] and to other Federal officials such steps as it deems necessary or desirable for the protection and conservation of marine mammals." *Id.* § 1402(a)(4). The MMPA then requires that the Secretary and other officials "shall . . . respond[ ]" to those recommendations within 120 days after receipt. *Id.* § 1402(d). If the official does not follow or adopt the MMC's recommendation, the official must provide "a detailed explanation of the reasons why those recommendations were not followed or adopted." *Id.*

**B.  The Administrative Procedure Act**

42.     The APA requires that "each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). The APA further requires that "within a reasonable time, each agency shall proceed to conclude a matter presented to it," *id*. § 555(b), and that agencies give "prompt notice" if they deny a petition, providing "a brief statement of the grounds for denial," *id.* § 555(e).

43.     The APA provides a cause of action to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." *Id.* § 702. Under the APA, agency action includes an agency's "failure to act." *Id.* § 551(13). The APA requires the reviewing court to: "(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . ." *Id.* § 706.

## FACTUAL BACKGROUND

### A.  The Plight of the Vaquita

44.     The vaquita is the world's smallest porpoise, reaching a maximum length of about four feet, with conspicuous black patches around its eyes and mouth. The vaquita is only found one place in the world: Mexico's Upper Gulf of California.

45.     The vaquita is critically endangered, and without immediate governmental action, it may soon disappear from our planet altogether. The population has declined by more than 95 percent over the last two decades, plummeting from more than 700 individuals in 1990 to fewer than 30 individuals today.

46.     In 1997, the Mexican Government created the Comité Internacional para la Recuperación de la Vaquita (International Committee for the Recovery of the Vaquita, or "CIRVA"), bringing together the world's preeminent vaquita experts to address the vaquita's decline. Numerous U.S. government employees, including staff from NMFS, have both served on and advised CIRVA over the last 20 years.

47.     In its eighth meeting report published in February 2017, CIRVA estimated that the vaquita had suffered an "average annual rate of decline between 2011 and 2016" of "39%,

corresponding to a population decline of 90% over this five-year period," with the annual decline rate increasing to 49 percent in 2015 and 2016. At this rate, the vaquita will be functionally extinct – i.e., no longer viable and unable to reproduce sustainably – by 2019, just over a year from now.

48.     The vaquita's decline is attributable to historic and ongoing bycatch in gillnets used in numerous Mexican fisheries. A gillnet is a wall of netting that fishermen hang vertically in the water column to catch target species. Gillnets come in various mesh sizes and fishermen use them actively or set them with weights and buoys for later retrieval. Gillnets are notorious for catching and killing non-target species, including marine mammals, sea turtles, and even birds.

49.     Mexican fisheries that have legally or illegally used and/or continue to use gillnets in the vaquita's habitat include fisheries targeting shrimp, sharks, rays, and various finfish, including corvina, sierra, chano, and totoaba, an endangered croaker fish.

50.     As recently as November 11, 2017, Mexico's Secretary of the Environment and Natural Resources ("SEMARNAT") Rafael Pacchiano Alamán stated before the Mexican Congress that the two principal causes of the deaths that threaten the vaquita are commercial shrimp fishing and the illegal fishery for totoaba. A subsequent, official SEMARNAT press release stated that fishing gear used to catch shrimp and other types of finfish represent a threat to the vaquita.

51.     Additionally, CIRVA has repeatedly stated that the use of gillnets by any fishery in the vaquita's range is incompatible with the survival of the species. In its 2017 report, CIRVA once again repeated its recommendation "that the Government of Mexico implement a permanent ban on *all* gillnets throughout the entire range of the vaquita."

17

**B.  Plaintiffs' Rulemaking Petition and the Government's Failure to Respond**

52.     On May 18, 2017, Plaintiffs submitted an emergency petition requesting that the Secretaries of Commerce, Treasury, and Homeland Security immediately implement MMPA Section 101(a)(2) and ban the import of all fish and fish products from Mexico sourced in a manner that "results in the incidental kill or incidental serious injury" of vaquita "in excess of United States standards." Specifically, Plaintiffs requested that the government ban all fish and fish products originating from the vaquita's range in the Upper Gulf of California that were obtained using any kind of gillnet, the fishing gear solely responsible for the near-extinction of the vaquita.

53.     As described in Plaintiffs' petition, the current level of mortality of vaquita in gillnets in Mexico's Upper Gulf of California vastly exceeds the relatively conservative bycatch limit (far fewer than one per year) that would be allowed for U.S. fishermen under the MMPA for a critically endangered and declining marine mammal species like the vaquita and is thus "in excess of United States standards." *See* 16 U.S.C. § 1371(a)(2); 50 C.F.R. §§ 216.24(h)(6)(iii)(C); 216.3.

54.     Further, Plaintiffs requested that NMFS use its emergency rulemaking authority under the MMPA Imports Rule to implement the ban, which NMFS acknowledged could be used to quickly ban imports from fisheries "having or likely to have an immediate and significant adverse impact on a marine mammal stock." 81 Fed. Reg. at 54,395. As stated in Plaintiffs' petition, the Upper Gulf of California gillnet fisheries are having an immediate and significant adverse impact on vaquita, as the fisheries present an "unacceptable ecological risk" to a "very small population[] where any incidental mortality could result in increased risk of extinction." *Id.*

18

55.    NMFS acknowledged receipt of Plaintiffs' petition by publication of notice in the Federal Register. *See* 82 Fed. Reg. 39,732 (Aug. 22, 2017).

56.    More than seven months have passed since Plaintiffs filed their emergency petition.

57.    Despite the APA's requirement that an agency respond to a petition "within a reasonable time," the vaquita's imminent extinction if current bycatch trends continue in the Upper Gulf, and NMFS's clear authority to conduct emergency rulemaking under precisely this situation, Defendants have failed to issue a substantive response to Plaintiffs' petition or otherwise ban relevant imports from Mexico. Defendants' delay is patently unreasonable.

### C.  Marine Mammal Commission's Recommendations and Government's Failure to Respond

58.    In addition to Plaintiffs' emergency petition, on March 1, 2017, the U.S. Marine Mammal Commission ("the Commission") submitted a letter to NMFS stating that "the gillnet fisheries of the upper Gulf of California . . . continue to cause high levels of bycatch mortality for the vaquita," highlighting concerns about legal gillnet fishing for corvina and continued illegal gillnet fishing for totoaba and shrimp, some of which enters the U.S. market. Accordingly, the Commission specifically recommended "that NMFS consider emergency rulemaking to make a finding that" gillnet fisheries in Mexico's Upper Gulf of California "do not meet the standards applicable under section 101(a)(2) of the MMPA."

59.    As stated above, MMPA Section 1402(d) requires that NMFS "shall . . . respond[ ] to" "[a]ny recommendations made by the Commission" within 120 days of receiving such a recommendation. 16 U.S.C. § 1402(d).

60. Upon information and belief, NMFS has not formally responded to the Commission's recommendations for an emergency rulemaking for vaquita.

61.     Additionally, on September 21, 2017 and in response to NMFS's Federal Register notice regarding Plaintiffs' petition, the Commission submitted another letter to NMFS again formally recommending that "NMFS act immediately to invoke the emergency rulemaking provisions of the MMPA import rule to ban the import into the United States of all fish and fish products from fisheries that kill or seriously injure, or that have the potential to kill or seriously injure vaquitas."

## CLAIMS FOR RELIEF

### FIRST CLAIM

### Failure to Timely Respond to Petition

62.     Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

63.     On May 18, 2017, Plaintiffs submitted an emergency petition requesting that the Secretaries of Commerce, Treasury, and Homeland Security immediately implement Marine Mammal Protection Act ("MMPA") Section 101(a)(2) and ban the import of all fish and fish products from Mexico sourced in a manner that "results in the incidental kill or incidental serious injury" of vaquita "in excess of United States standards," pursuant to MMPA Section 101(a)(2) and emergency rulemaking authority provided thereunder. 16 U.S.C. § 1371(a)(2); 81 Fed. Reg. 54,390, 54,395 (Aug. 15, 2016).

64.     The Administrative Procedure Act ("APA") provides for judicial review to a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," and "agency action" includes the "failure to act." 5 U.S.C. §§ 702; 551(13). Further, under the APA, agencies must respond to petitions "within a reasonable time," and a

reviewing court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." *Id.* §§ 555(b); 706(1).

65.     However, despite the passage of seven months and scientists' estimates that, if current bycatch trends continue, the vaquita will be functionally extinct by 2019, Defendants have failed to substantively respond to Plaintiffs' petition.

66.     Accordingly, Defendants have unlawfully withheld and/or unreasonably delayed their response to the petition in violation of the APA. 5 U.S.C. §§ 555(b); 706.

## SECOND CLAIM

### Failure to Timely Respond to Marine Mammal Commission's Recommendations

67.     Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

68.     On March 1, 2017, the Marine Mammal Commission ("the Commission") submitted a letter to the National Marine Fisheries Service ("NMFS") specifically recommending "that NMFS consider emergency rulemaking to make a finding that" gillnet fisheries in Mexico's Upper Gulf of California "do not meet the standards applicable under section 101(a)(2)" of the Marine Mammal Protection Act ("MMPA") for protecting the vaquita.

69.     Section 1402(d) of the MMPA requires that NMFS "shall . . . respond[ ] to" "[a]ny recommendations made by the Commission" within 120 days of receiving such a recommendation. 16 U.S.C. § 1402(d)

70.     Upon information and belief and despite the passage of over nine months, NMFS has failed to formally respond to the Commission's recommendations for an emergency rulemaking under Section 101(a)(2) of the MMPA.

71.     The Administrative Procedure Act ("APA") provides for judicial review to a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," and "agency action" includes the "failure to act." 5 U.S.C. §§ 702; 551(13). Further, under the APA, a reviewing court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

72.     Accordingly, Defendants have unlawfully withheld and/or unreasonably delayed their response to the Commission's recommendations in violation of the APA and the MMPA. 5 U.S.C. § 706; 16 U.S.C. § 1402(d).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests this Court:

1. Declare that Defendants unreasonably delayed and unlawfully withheld their response to Plaintiffs' petition in violation of the APA;

2. Declare that Defendants unreasonably delayed and unlawfully withheld their response to the Marine Mammal Commission's recommendations in violation of the APA;

3. Enter an order enjoining Defendants from further delay in responding substantively to the Plaintiffs' petition and requiring a response within 30 days;

4. Enter an order enjoining Defendants from further delay in responding substantively to the Marine Mammal Commission's recommendation and requiring a response within 30 days;

5. Award Plaintiffs the costs of this action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

6. Grant any other relief this court finds just and proper.

Dated:  December 21, 2017                    Respectfully submitted,


                                              /s/ Sarah Uhlemann_____
                                            Sarah Uhlemann
                                            DC Bar No. 501328
                                            Center for Biological Diversity
                                            2400 80th Street NW
                                            Seattle, WA 98117
                                            (206) 327-2344
                                            suhlemann@biologicaldiversity.org

                                            Tanya M. Sanerib
                                            DC Bar No. 473506
                                            Center for Biological Diversity
                                            2400 80th Street NW
                                            Seattle, WA 98117
                                            (206) 379-7363
                                            tsanerib@biologicaldiversity.org

                                            *Attorneys for Plaintiff Center for Biological
                                            Diversity*


                                            Stephen Zak Smith
                                            *Pro hac vice admission
                                            pending*
                                            Natural Resources Defense Council
                                            1314 2nd Street
                                            Santa Monica, CA 90401
                                            (310) 434-2334
                                            zsmith@nrdc.org

                                            *Attorney for Plaintiff Natural Resources Defense
                                            Council*


                                            Nadia Adawi
                                            *Pro hac vice admission
                                            pending*
                                            Animal Welfare Institute
                                            900 Pennsylvania Ave. SE
                                            Washington, DC 20003
                                            (202) 446-2122
                                            nadia@awionline.org

*Attorney for Plaintiff Animal Welfare Institute*